# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BROOKRIDGE FUNDING CORP. | : | |
|     Plaintiff | : | |
| | : | |
|     v. | : | 3:08-cv-1684 (CFD) |
| | : | |
| KING & PRINCE SEAFOOD CORP. | : | |
| and PAUL J. OBIREK | : | |
|     Defendants. | : | |

## RULING ON MOTION TO DISMISS

    This is a diversity case alleging negligence, negligent misrepresentation, intentional misrepresentation, tortious interference with contract, conversion, replevin, civil theft, and violations of the Connecticut Uniform Trade Practices Act.  The suit arises out of seafood purchase orders by the defendants.  The plaintiff provided purchase order financing for those purchases.  The defendants moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, under Fed. R. Civ. P. 12(b)(3) because Connecticut is not a proper venue, and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  On May 13, 2009, the Court held oral argument on the motion to dismiss, as well as an evidentiary hearing on the issue of personal jurisdiction.  For the reasons set forth below, the motion to dismiss is granted because the Court's exercise of personal jurisdiction over the defendants would not comport with due process.

**I.    Background**

    The plaintiff, Brookridge Funding Corp. ("Brookridge"), is a Delaware Corporation with its principal place of business in Danbury, Connecticut.  The defendant, King & Prince Seafood

Corp. ("King & Prince"), is a Georgia corporation with its principal place of business in Georgia. King & Prince is in the business of purchasing and reselling food. The individual defendant, Paul Obirek ("Obirek") is a resident of Georgia, and was at all relevant times King & Prince's Purchasing Manager. Regina Johnson ("Johnson") was at all relevant times King & Prince's Administrative Assistant in the Procurement Department.

Seascape Seafood, Inc. ("Seascape"), a Texas corporation that sold wholesale seafood, is central to the facts of this lawsuit, but is not a party.[1] Hallgrimur Einarsson ("Einarsson") was the President of Seascape at all relevant times.

LSQ Funding Group ("LSQ"), also not a party to this action, provided factoring to Seascape.[2]

### A. Purchase Order Structure

On August 26, 2004, Brookridge and Seascape entered into a Purchase Order Purchase Agreement (the "PO Agreement"). Under the PO Agreement, Brookridge agreed to finance Seascape's purchase of goods that it had pre-sold to customers. Specifically, when a customer placed a purchase order to buy seafood from Seascape, Seascape would, in accordance with the PO Agreement, ask Brookridge to provide financing to fill the customer's purchase order. Brookridge would then verify the purchase order by contacting the customer to make sure the purchase order was legitimate. If verified, Brookridge would finance the purchase of the

---

[1] On October 22, 2007, Brookridge obtained a Connecticut Superior Court default judgment against Seascape and Hallgrimur Einarsson for more than $1.2 million in damages, attorneys fees, and costs. See Ex. A & B to Mot. to Dismiss.

[2] Factoring is a transaction in which a financial organization, "the factor," contractually purchases the accounts receivable of a seller of goods. Customers of that seller of goods then directly pay the factor the full value of the account receivable.

seafood. Upon Seascape's delivery of the seafood to the customer, an account receivable was created. As explained in the PO Agreement, Seascape had entered into a separate account receivable agreement with LSQ ("LSQ Agreement") whereby LSQ had the option to purchase the account receivable. Compl. Ex. A. ¶ 4. In order to purchase the account receivable, LSQ would submit payment directly to Brookridge. Id.

King & Prince began to purchase seafood from Seascape in October 2005.[3] In accordance with the aforementioned financing structure, when King & Prince sent a purchase order to Seascape, Seascape would forward the purchase order to Brookridge in order to secure purchase order financing. Brookridge would then contact King & Prince to verify that King & Prince had ordered seafood from Seascape. Once King & Prince provided verification, Brookridge would finance Seascape's provision of seafood to King & Prince. Upon Seascape's delivery of the seafood to King & Prince, an account receivable was created. LSQ would then purchase the account receivable from Seascape by directly paying Brookridge. Because LSQ owned the account receivable, King & Prince would pay LSQ directly for the seafood.

Under this structure, King & Prince's only contact with Brookridge resulted from Brookridge's contacting King & Prince to verify individual purchase orders. Katherine Andros, a Brookridge employee, testified at the evidentiary hearing that she and another Brookridge employee, Michelle Sanford, verified each individual King & Prince purchase order by calling or emailing Paul Obirek or Regina Johnson at King & Prince. Brookridge produced records in which Andros and Sanford noted on purchase orders that they had verified each order with

---

[3]Brookridge's complaint incorrectly stated that King & Prince began to purchase seafood from Seascape in 2004. Compl. ¶ 10. At the evidentiary hearing, witnesses for Brookridge and King & Prince corrected the complaint and provided the October 2005 date.

Obirek or Johnson. See Pl.'s Ex. 5. Brookridge also produced emails to this effect. See Compl. Ex. B. Although not reflected in Brookridge's records, Andros also testified that when King & Prince initially started doing business with Seascape in October of 2005, she separately spoke with both Johnson and Obirek and explained the relationship between Brookridge and Seascape, including that King & Prince would have to verify purchase orders in order for Brookridge to provide purchase order financing to Seascape. Brookridge does not dispute that no King & Prince employee ever initiated contact with Brookridge. Regina Johnson also testified at a deposition that she did not know who Brookridge was or what role it played in King & Prince's purchase of seafood from Seascape. Johnson Dep. at 22:4-6.

**B.     Events Leading to Suit**

Brookridge claims that it financed for Seascape eighteen[4] King & Prince purchase orders from July 2006 through August 2006. King & Prince does not dispute that someone at King & Prince responded to inquiries by Brookridge about whether those purchase orders were valid, see Compl. Ex. B (emails verifying purchase orders), and that Brookridge subsequently provided to Seascape purchase order financing for those orders.

On September 25, 2006, Seascape President Hal Einarsson wrote an email to Regina Johnson, copied to Obirek, the subject of which was "Change of P.O.'s." See Compl. Ex. C. This email referenced Einarsson's conversation earlier that morning with Obirek. In the email Einarsson cancelled six King & Prince purchase orders, and informed Johnson that the "company

---

[4]The plaintiff attached to the complaint numerous emails sent in July, August, and September that appear to verify eighteen King & Prince purchase orders. See Compl. Ex. B. The defendants make no specific representation about the number of King & Prince purchase orders in July and August 2006.

that can deliver this product is: Almarr Seafoods, Ltd." Id.  Also in this email, Einarsson wrote: "**I would also like to ask you to do the following for me**: If you get a call from Brookridge Funding or LSQ Funding Group, then just tell them that our account is in review because of quality issues that have been developing over the last few weeks and that you can not give any further information at this time." Id. (emphasis in original).  Obirek testified that at the time he did not think anything of Einarsson's email request because he considered Seascape, Euclase, and Alamar to essentially be the same vendor.  Obirek testified and Brookridge does not dispute that neither Johnson nor Obirek responded to Einarsson's email.

Brookridge alleges that King & Prince is liable because, despite having verified "the genuineness of the Subject POs and understanding that the purpose of this act would cause the Plaintiff to finance the seafood produce in fulfilment thereof, King & Prince and Obirek without notice to or consent from Plaintiff, changed the Subject POs so that payment for the seafood was not made to Seascape, LSQ, or the Plaintiff." Compl. ¶ 24.  The defendants respond that it was Seascape by way of Einarsson that initiated cancellation of the purchase orders, and that once they were cancelled, King & Prince simply paid a different supplier for the seafood.

**II.     Standard of Review**

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff has the burden of showing that the court has jurisdiction over the defendant. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996).  The Court may exercise personal jurisdiction over a defendant if (1) the defendant's conduct satisfies the requirements of the Connecticut long-arm statute, Inset Sys., Inc. v. Instruction Set, Inc., 937 F. Supp. 161, 163 (D. Conn. 1996), and (2) the defendant has certain "minimum contacts with [the forum] such that the

maintenance of the suit does not offend traditional notions of fair play and substantial justice," International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

## III.     Discussion

The defendants argue that the Court's exercise of personal jurisdiction over them does not comport with constitutional due process because they do not have sufficient minimum contacts with Connecticut.[5]  For a defendant to be subject to suit in a forum where it is not physically present, due process demands certain "minimum contacts" with the forum such "as make it reasonable . . . to require the corporation to defend the particular suit which is brought there." International Shoe, 326 U.S. at 316-17.  To constitute minimum contacts with a state for specific personal jurisdiction, the defendant's actions must provide him with fair warning.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).  This requirement is satisfied if the defendant purposefully directs activities at Connecticut and litigation arises out of those activities, id., or the defendant "purposefully avails" himself of the privilege of conducting activities within the forum state.  Hanson v. Denckla, 357 U.S. 235, 253 (1958).  Additionally, activities must be of such character that the defendant would reasonably anticipate being haled into court in Connecticut.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).  A defendant may not be haled into a jurisdiction solely as a result of "'random,' 'fortuitous,' or 'attenuated'" contacts.  Burger King, 471 U.S. at 486 (quoting World-Wide Volkswagen, 444

---

[5]The plaintiff argues the Court has long-arm jurisdiction over King & Prince and Obirek under Conn. Gen. Stat. § 33-929(f) and Conn. Gen. Stat. § 52-59b, respectively.  Because it is evident that the Court's exercise of personal jurisdiction over the defendants would offend due process, it is unnecessary to address whether it would have personal jurisdiction over the defendants under the long-arm statutes.

U.S. at 299). The "unilateral activity of another party or a third person is not an appropriate consideration." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984). "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." Burger King, 471 U.S. at 475.

Based on the evidence before the Court, and crediting the testimony of Katherine Andros, the sum of King & Prince's contacts with Connecticut are as follows: that in October 2005, Andros called both Obirek and Johnson and explained to them Brookridge's relationship with Seascape, including that King & Prince would have to verify their Seascape purchase orders with Brookridge in order for Brookridge to provide Seascape with purchase order financing; and that from October 2005 through August 2006, Obirek and Johnson on dozens of occasions responded by way of phone or email to Brookridge's inquiries for verification of purchase orders. King & Prince was not a party to the Brookridge-Seascape PO Agreement, but rather sent its purchase orders directly to Seascape. King & Prince also paid LSQ, whose factoring contract was with Seascape. The only other mention of Brookridge to King & Prince was in Einarsson's September 25, 2006 email to Johnson and Obirek, to which Johnson and Obirek did not respond.

These contacts are not sufficient for this Court's exercise of personal jurisdiction over King & Prince. Brookridge unilaterally contacted King & Prince to verify purchase orders under the terms of its agreement with Seascape. King & Prince simply responded to Brookridge's requests for verification. King & Prince did not have any formal relationship with Brookridge, and the company did not purposefully avail itself of the privilege of conducting business in Connecticut. In fact, nowhere is it alleged or evidenced that Obirek or Johnson knew that

Brookridge was located in Connecticut. While there are a number of cases in which courts found the requisite "minimum contacts" when a nonresident defendant's only contact with the forum state was a single misrepresentation into the forum state, see, e.g., David v. Weitzman, 677 F. Supp. 95, 99-100 (D. Conn. 1987) (upholding personal jurisdiction when the defendant sent communication into Connecticut to promote the sale of a condominium); Brown v. Flowers Industries, Inc., 688 F.2d 328 (5th Cir.1982) (defendant's single defamatory telephone call into forum sufficient for due process), in this case the nonresident defendant indisputably did not initiate any communication into Connecticut. Rather, there is no evidence here that King & Prince or Obirek directed any activity at Connecticut; Obirek and Johnson did not purposefully avail themselves of Connecticut by responding to Brookridge-initiated requests for verification, especially as there is no evidence that Obirek or Johnson knew Brookridge was located in Connecticut. See, e.g., Margolis v. Gillam, No. CV94-0363504, 1995 WL 94548, *5 (Conn. Super. Ct. Feb 22, 1995) (holding that exercise of personal jurisdiction would offend due process where the defendants "did not initiate any conduct within Connecticut, but rather, merely received a telephone call during which they responded to inquiries concerning the plaintiff"); Cathey v. Scipione, No. CIV.A.3:96-CV-1730-G, 1997 WL 242898, *5 (N.D. Tex. May 1, 1997) ("The two unsolicited phone calls placed by Durham to Dickman-which are the only contacts alleged by Cathey to support the exercise of personal jurisdiction-do not show that Dickman expressly aimed his activity at Texas. To the contrary, these telephone calls amount to unilateral activity on Cathey's part and thus cannot form a basis on which the court may exercise personal jurisdiction over Dickman."). Because King & Prince did not initiate any contacts with Connecticut, the Court's exercise of personal jurisdiction over King & Prince would not comport

with due process.

**IV.     Conclusion**

       For the reasons set forth above, the defendants' motion to dismiss [Dkt. # 19] is granted.

The clerk is directed to close this case.

       SO ORDERED this   22nd   day of June 2009, at Hartford, Connecticut.

                                **/s/Christopher F. Droney**
                                **CHRISTOPHER F. DRONEY**
                                **UNITED STATES DISTRICT JUDGE**